**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**DIANNE MCGOWAN, individually**
**and on behalf of all others similarly**
**situated,**

      **Plaintiffs,**

**vs.**

                    **CASE NO.: 3:22-cv-02770-ZNQ-RLS**

**CFG HEALTH NETWORK, LLC**
**d/b/a CFG HEALTH NETWORK**
**COMPANIES**

      **Defendant.** _____ /

**ORDER GRANTING PLAINTIFF'S UNOPPOSED MOTION FOR FINAL**
**APPROVAL OF CLASS ACTION SETTLEMENT AND FLSA SETTLEMENT**

The Court previously preliminarily approved the Parties' settlement by Preliminary Approval Order ("Order") dated November 17, 2023. D.E. 33. Pursuant to the Court's Order, notice of the settlement was transmitted to all members of the settlement class. To date, no one has objected to the settlement or requested to be excluded. By the instant Motion, Plaintiff now seeks final approval of the Parties' settlement under both Federal Rule of Civil Procedure 23, and under 29 U.S.C. § 216(b) (the "FLSA"), including approval of attorneys' fees and costs and the general release payment to the named-Plaintiff under the settlement. Plaintiff further requests that the Court enter the Proposed Final Approval Order. Because the Parties' settlement satisfies all of the *Girsh* factors and is a resolution of a bona fide dispute, the Court grants the Motion in its entirety.

## I.    BACKGROUND

This action, which began on May 11, 2022, is a hybrid wage and hour collective action under the FLSA and class action under the New Jersey Wage and Hour Law ("NJWHL") and New Jersey Wage Payment Law ("NJWPL"), against CFG Health Network, LLC ("CFG" or "Defendant"). *See* ECF No. 1 (the "Complaint"). To track time, calculate overtime and process payroll for its non-exempt employees, CFG used Kronos, a cloud-based timekeeping and payroll system. On or around December 11, 2021, the Kronos cloud system became inoperable, purportedly caused by a cyberattack. As a result of such Kronos outage, Defendant was unable to access any timekeeping or payroll data stored or entered into the Kronos system affecting multiple bi-weekly pay periods from December 12, 2021, to May 6, 2022 ("Kronos Outage"). During that time, some employees were not timely paid all wages they earned, based on hour worked.

Defendant asserts that it acted in good faith at all times following the Kronos Outage, including the timely institution of back-up manual and electronic timekeeping processes, and that after the Kronos system was restored, Defendant reconciled and paid all unpaid wages and overtime compensation related to the bi-weekly pay periods at issue by May 6, 2022. As a result of this reconciliation process, it was determined that during the Kronos Outage, Defendant underpaid wages to 323[1] non-exempt employees in the aggregate amount of $231,159.24. Following the conclusion of the Kronos Outage, Defendant took steps to ensure all underpaid employees received any outstanding back wages, and following its reconciliation process, Defendant issued remaining reconciliation payments to affected employees on May 6, 2022.

---

[1] At the time of the Preliminary Approval Order, the Parties incorrectly believed that this number was 313 affected employees.

On March 29, 2023, after Defendant produced a significant amount of data and other information regarding the Kronos outage and Defendant's reconciliation process, the Parties participated in a full-day mediation with Dennis Clifford, a highly regarded mediator with significant experience in class and collective action labor and employment wage and hour litigation. The Parties were able to reach a settlement at the mediation after a full day of negotiations. Since that time, after substantial further work and negotiations on the settlement terms, the Parties were able to reach a final Settlement Agreement.

The Parties recognize and acknowledge the benefits of settling this case and the risks of not settling this case. Plaintiff believes that the claims asserted in this case have merit and that the evidence developed to date supports the claims on class/collective basis. Despite the strength of her case, Plaintiff is mindful of the arguments that will be raised by Defendant's able counsel. Plaintiff further recognizes and acknowledges the expense and length of time that proceedings necessary to prosecute this matter as a class action against Defendant, post-trial proceedings, and any appeals would take. Counsel for Plaintiff have taken into account the uncertain outcome and risks of the litigation, as well as the difficulties and delays inherent in such litigation. Counsel for Plaintiff has, therefore, determined that the Settlement set forth in the Settlement Agreement is fair, reasonable, and adequate. The Settlement confers substantial benefits upon, and is in the best interests of, Plaintiff and the Settlement Class and Collective (hereafter defined) and as further explained below.

Defendant maintains that it has a number of meritorious defenses to the claims asserted in this action, including defenses to the merits (i.e. "good faith"), defenses to the certification of the case as a class action, defenses to conditional certification, as well as arguments for future decertification. Nevertheless, Defendant recognizes the risks and uncertainties inherent in

litigation, the significant expense associated with defending a potential class action, the costs of any appeals, and the disruption to its business operations arising out of class action litigation. Accordingly, Defendant believes that the Settlement set forth in the Settlement Agreement is likewise in its best interests.

## A. TERMS OF THE SETTLEMENT

The Settlement Agreement defines the Putative Rule 23 Class as:

> those non-exempt employees, regardless of exact title, employed by Defendant in New Jersey, between December 11, 2021 and May 6, 2022, who were net underpaid as a result of the Kronos outage.

Likewise, the Settlement Agreement defines the Putative FLSA Collective as:

> those non-exempt employees, regardless of exact title, employed by Defendant in New Jersey, between December 11, 2021 and May 6, 2022, who were net underpaid as a result of the Kronos outage.

There are approximately 323 Putative Rule 23 Class Members, who are also Putative FLSA Collective Members.

The Settlement Agreement provides for a maximum Gross Settlement Amount of $475,000, including all payments to Settlement Class and Collective Members, attorney's fees and litigation expenses, costs of notice and claims administration of the settlement, and a general release payment to McGowan (the "Gross Settlement Amount"). Plaintiffs' counsel has agreed to seek no more than $158,333.33, which represents 1/3 of the Gross Settlement Amount, and costs/expense reimbursements amounting to $4,827.29. The Parties further agree that Plaintiff McGowan will receive $5,000.00 to be paid from the Gross Settlement Amount, in consideration for executing a General Release of Claims to be paid from the Qualified Settlement Fund ("QSF").

The amount allocated to settlement payments to the Settlement Class will be distributed as follows:

> Each Claimant who is designated as "Net-Under" shall be paid their pro-rata share of their underpaid amount as compared to the total amount of the "Net-Under" Claimants' aggregate underpayment amount, provided that no underpaid worker will receive an amount less than $20.00.

Any and all claims of any Putative Rule 23 Class Member under New Jersey law who does not affirmatively opt-out of the Action will be forever released against Defendant and its subsidiaries, as described more fully in the Settlement Agreement. In addition, any Putative FLSA Collective member who signs, deposits and/or cashes their Settlement check shall be deemed an opt-in party under the FLSA, and thereby release related claims as defined in the Settlement Agreement. Further, in recognition of their receipt of the General Release Payment, any and all claims of any kind of the named Plaintiff will also be forever released against Defendant and its related entities and persons, as described more fully in the Settlement Agreement.

**B.    Preliminary Approval and Notice**

Following the Court's Preliminary Approval Order, the Parties' retained ILYM Group, a third-party administrator, to transmit the notices and administer the settlement. *See* Declaration of Makenna Snow ("Snow Dec."), ¶¶1, 3. Defendant provided contact information, on January 10, 2024, which was again run through the NCOA, prior to mailing. Snow Decl. at ¶¶4-5. On January 26, 2024, ILYM Group mailed the notice packet to all 323 class members. *Id.,* at ¶7. Of these, 9 were initially returned undelivered 2 with forwarded address and 7 without. *Id.,* at ¶8. For the ones returned without a forwarding address, ILYM Group then performed a skip trace to obtain better addresses for those it could. *Id.* Subsequently, it remailed the notice packets to 5 of the 9 class members, for whom it was able to obtain an updated address. *Id.* As of March 11, 2024, no class member had objected to the settlement and no class member had requested to be excluded from the settlement. *Id.,* at ¶¶11-12. Thus, all 323 class members are participating in the settlement

and are due to receive their proportional share of same. *Id.,* at ¶15. The Court held a fairness hearing on Tuesday, March 26, 2024.

## II.    DISCUSSION

### A. *Certification of Settlement Class*

In order to obtain class certification, a party must show that all four prerequisites of Rule 23(a) are met and that the case qualifies as at least one of the matters identified in Rule 23(b). *See Baby Neal ex rel. Kanter v. Casey,* 43 F.3d 48, 55 (3d Cir.1994) (citing *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.3d 239 (3d Cir.), *cert. denied,* 421 U.S. 1011 (1975)). Class certification calls for a "rigorous analysis" of the factual and legal allegations. *See Beck v. Maximus, Inc.,* 457 F.3d 291, 297 (3d Cir.2006) (quoting *Gen. Tele. Co. of Sw. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)); 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.61[1] (3d ed.2008). The Court therefore may conduct a "preliminary inquiry" into the merits before it determines that the requirements for class certification are satisfied. *See In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 316–17 (3d Cir.2008) (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 168 (3d Cir.2001)).

A party that seeks to certify a settlement class must satisfy the same requirements necessary to maintain a litigation class. *In re Gen. Motors Corp.,* 55 F.3d at 778. The substantive terms of the settlement agreement may factor into certain aspects of the certification calculus. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 619, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

Plaintiffs move under Rule 23(b)(3). The Court preliminarily found that the requirements of Rules 23(a) and 23(b)(3) were met. The Court now finds that all the requirements for class certifications are in fact satisfied.

### i.    *Rule 23(a) of the Federal Rules of Civil Procedure*

A case may be certified as a class action under Rule 23 only when: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a); *Weiss v. York Hosp.,* 745 F.2d 786, 807 (3d Cir.1984), *cert. denied,* 470 U.S. 1060 (1985). These four threshold requirements are commonly referred to as "numerosity," "commonality," "typicality," and "adequacy of representation," respectively. *See, e.g., In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 527 (3d Cir.2004).

### a.    *Numerosity*

Rule 23(a)(1) requires that the size of the class is so large that joinder of all potential parties is impracticable. Impracticability does not mean impossibility. *Dewey v. Volkswagen of Am.,* 728 F.Supp.2d 546, 656 (D.N.J.2010). Rather, it means that joinder would be "extremely difficult or inconvenient." *Szczubelek v. Cendant Mortgage Corp.,* 215 F.R.D. 107, 116 (D.N.J.2003) (citing *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.,* 149 F.R.D. 65, 73 (D.N.J.1993)). While no minimum number is required, the Third Circuit has stated that numerosity is generally met where the moving party "demonstrates that the potential number of plaintiffs exceeds 40...." *Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001) (citing 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.22[3][a] (3d ed.1999)), *cert. denied,* 536 U.S. 958, 122 S.Ct. 2661, 153 L.Ed.2d 836 (2002). The Court should also take into account other factors, such as the geographic dispersion of the anticipated class. *See Osgood v. Harrah's Entm't, Inc.,* 202 F.R.D. 115, 122 (D.N.J.2001) (citing Herbert B. Newberg & Alba Conte, 1 *Newberg on Class Actions* (hereinafter *Newberg on Class Actions* ) § 3.06, at 3–27 (3d ed.1992)).

The numerosity requirement is satisfied in this case. The class approved by this Court contains 323 putative class members. The members of the class are dispersed throughout New Jersey and the sheer number of potential plaintiffs would make joinder impracticable. *See* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.05, at 3–25 (4th ed.2002) (observing that classes "numbering in the hundreds" will alone satisfy numerosity); *see also NAACP v. N. Hudson Regional Fire & Rescue,* 255 F.R.D. 374, 382 (D.N.J.2009), *remanded on other grounds,* 367 Fed. Appx. 297 (3d Cir.2010) ("Even if all of the approximately 850 members of the proposed class here still live in Essex, Union or Southern Hudson County, joinder of over 800 additional plaintiffs would simply be impracticable.").

### b. Commonality

Next, Plaintiffs must demonstrate that there are questions of fact or law that are common to the members of the class. Fed.R.Civ.P. 23(a)(2). Commonality exists where the named plaintiffs share at least one question of fact or law with the grievances of the proposed class. *See In re Warfarin,* 391 F.3d at 527–28. Indeed, "Rule 23(a)(2) does not require that class members share every factual and legal predicate...." *In re Gen. Motors Corp.* ., 55 F.3d at 817. Thus, the commonality requirement is easily met in most cases because all that is required is one common issue. *Baby Neal,* 43 F.3d at 56.

Plaintiff clearly meets the low commonality threshold. All class members worked over forty hours and allege that they did not receive a proper amount of overtime pay for that time, and were otherwise not paid their full and proper wages on their regularly scheduled payday, as result of the Kronos outage. Courts regularly find commonality in similar wage and hour suits in which class certification is sought. *See, e.g., Bernhard v. TD Bank, N.A.,* No. 08–4392, 2009 WL 3233541, at *3 (D.N.J. Oct.5, 2009); *In re Janney Montgomery Scott LLC Fin. Consultant Litig.,*

No. 06–3202, 2009 WL 2137224, at *4 (E.D. Pa. July 16, 2009); *Lenahan v. Sears Roebuck and Co.,* No. 02–0045, 2006 WL 2085282, at *7 (D.N.J. July 24, 2006).

### c. *Typicality*

The claims of the representatives must also be typical of the claims of the class. Fed.R.Civ.P. 23(a)(3). The Third Circuit recently identified three interrelated considerations relevant to this inquiry: "(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." *In re Schering Plough Corp. ERISA Litig.,* 589 F.3d 585, 599 (3d Cir.2009). This component of Rule 23 is designed to ensure that "the [class representatives] will work to benefit the entire class through the pursuit of their own goals." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions* (*Prudential II* ). 148 F.3d 283, 311 (3d Cir.1998) (citing *Baby Neal,* 43 F.3d at 57), *cert. denied,* 525 U .S. 1114 (1999).

The typicality prong does not require that all putative class members share identical claims or underlying facts. *See Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 141 (3d Cir.1998), *cert. denied* 526 U.S. 1114, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999). All that is required is a strong similarity in legal theories or a showing that the claims arise from the same course of conduct. *See Prudential II,* 148 F.3d at 311–12; *Grasty v. Amalgamated Clothing & Textile Workers Union,* 828 F.2d 123 (3d Cir.1987) (citing 1 *Newberg on Class Actions* § 3.15, at 168 (2d ed.1985)), *abrogated in part on other grounds by Reed v. United Transp. Union,* 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989).

All class members allege that they were improperly/undercompensated and/or that their compensation was delayed as a result of the Kronos outage and CFG's response to same. The injury sustained by the class representatives is the same as the injury sustained by the class as a whole. They seek same relief as all putative class members. Because the class representatives challenge the same underlying conduct as do all members in the putative class, the interests of the class representatives are completely aligned with the interests of the entire class. *See Newton,* 259 F.3d at 183–84 ("If the claims of the named plaintiffs and putative class members involve the same conduct by defendant, typicality is established regardless of factual differences."). Moreover, the named Plaintiff is subject to the same overarching defenses as are all class members (i.e. "good faith"). The claims of the class representative are therefore typical of the absentees.

### d. Adequacy of Representation

Adequate representation focuses on two criteria: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel,* 508 F.2d at 247. These distinct inquiries assess the adequacy of class counsel and the adequacy named plaintiffs, respectively, to represent the rest of the class. *See Prudential II,* 148 F.3d at 312; *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 630 (3d Cir.1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Plaintiff clearly meets both of these prongs here. First, class counsel is comprised of competent and experienced class action attorneys that are readily capable of prosecuting Plaintiff's claims. Class counsel is highly experienced in wage-and-hour litigation, having handled hundreds of collective/class action wage and hour cases throughout the country in the last 15 years. In fact, they are involved in dozens of federal and state wage-and-hour cases arising from the Kronos outage, cases which are very similar factually to the case at

bar. The Court observes that class counsel have competently and vigorously pursued the interests of the class throughout the litigation.

Second, there are no conflicts between class representatives and other class members. The second prong serves to uncover conflicts of interest between the named parties and the class they seek to represent. *See Amchem,* 521 U.S. at 626 n. 20 (citing *Falcon,* 457 U.S. at 157–58 n. 13). Indeed, the absence of collusion or undue pressure assumes a "crucial" role in the context of settlement class certification. *See In re Gen. Motors Corp.,* 55 F.3d at 799 n. 21. Plaintiffs must prove the same wrongdoing as the absent class members in order to establish liability in this matter. Further, the settlement allocation formula poses no conflict because damages are calculated in the same way for the named Plaintiff as for all other class members. *See Lenahan,* 2006 WL 2085282, at *8. Given the absence of any conflict, and the stellar qualifications of class counsel, the Court finds that the adequacy requirement is easily met. In light of the foregoing, the class plainly satisfies each of the four prerequisites to class certification contained in Rule 23(a). The Court therefore now turns to Rule 23(b)(3).

### ii. *Rule 23(b)(3) of the Federal Rules of Civil Procedure*

Federal Rule of Civil Procedure 23(b)(3) permits the court to certify a class in cases where "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). These dual requirements are commonly referred to as "predominance" and "superiority," respectively. *See, e.g., In re Constar Int'l, Inc. Sec. Litig.,* 585 F.3d 774, 780 (3d Cir.2009).

### a. *Predominance*

Predominance probes whether the proposed class is sufficiently cohesive to warrant adjudication by representation. *See Amchem,* 521 U.S. at 623 (citing 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1777, at 518–19 (2d ed.1986)). Although it tends to merge with the concept of commonality, it imposes a more exacting standard. *See Newton,* 259 F.3d at 186. To establish predominance, issues common to the class must predominate over individual issues. *Prudential II,* 148 F.3d at 313–14. Common issues do not "predominate," and the case in inappropriate for certification, if "proof of the essential elements of a cause of action require individual treatment." *Newton,* 259 F.3d at 172 (citing *Binder v. Gillespie,* 184 F.3d 1059, 1063–66 (9th Cir.1999), *cert. denied,* 528 U.S. 1154, 120 S.Ct. 1158, 145 L.Ed.2d 1070 (2000)). Whether an element requires individual or common treatment depends nature of the evidence that will suffice to resolve it. *See In re Hydrogen Peroxide,* 552 F.3d at 311 (quoting *Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir.2005)). When an issue requires both individual and common proofs, the Court must determine which proof is key to its outcome. *See In re Lineboard,* 305 F.3d at 162–163. Indeed, the presence of some individual issues "does not *per se* rule out a finding of predominance." *Prudential II,* 148 F.3d at 315.

Here, the Kronos outage and the acts/omissions CFG undertook both before and after same applied uniformly to all class members. Plaintiff contend that CFG violated applicable state law and CFG claims that it did not. Whether CFG violated state wage and hour law and whether it can demonstrate "good faith" in its actions/omissions is "about the most perfect question[ ] for class treatment." *Iglesias–Mendoza v. La Belle Farm, Inc.,* 239 F.R.D. 363, 373 (S.D.N.Y.2007). Where, as here, "common issues which determine liability predominate," calculating damages on an individual basis does not prevent an otherwise valid certification. *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 456 (3d Cir.1977) (citations omitted); *see also In re Community Bank of N. Va.,* 418

12

F.3d 277, 306–07 (3d Cir.2005); *In re Lineboard,* 305 F.3d at 163. Thus, issues common to the class predominate over individual issues.

### b. Superiority

The non-exhaustive list of factors that a court may consider in evaluating the superiority of a class action include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed.R.Civ.P. 23(b)(3). This prong of Rule 23(b)(3) asks the Court to "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine,* 83 F.3d at 632 (quoting *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 757 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974)).

A class action in New Jersey is the "superior" method of adjudicating this controversy. First, the relatively modest size of each individual claim counsels that independent actions would likely be impracticable. *See Georgine,* 83 F.3d at 633 (citing Fed.R.Civ.P. 23(b)(3) advisory note to 1966 amendment). The class action procedure would serve to spread the costs of litigation across a greater pool of injured parties, *In re Gen. Motors,* 55 F.3d at 783–84, and the total amount of potential liability is not so significant as to impose "hydraulic pressure" on CFG to settle in the face of marginal claims. *See Newton,* 259 F.3d at 167 n. 8 (citing *In re Rhone–Paulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir.), *cert. denied,* 516 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995)). Any potential interest in maintaining individual actions is further diminished by the fact that there are no other pending lawsuits arising from the same allegations beyond those involved in the

settlement. *See In re Warfarin,* 391 F.3d at 534 (citing *Prudential II,* 138 F.3d at 316). Second, New Jersey is also the most appropriate forum for the class. All of the class members worked for CFG in New Jersey. Concentrating litigation in New Jersey is also desirable because it is home to Liberty's corporate headquarters. *See In re Warfarin,* 391 F.3d at 534 (citing *Prudential II,* 138 F.3d at 316). Finally, the class consists of a fully-matured set of claims; the class itself closed at the point in time when CFG made the retroactive payment of unpaid/delayed wages. *See Newton,* 259 F.3d at 192. The class action mechanism is both fair and efficient in these cases.

Having determined that the class satisfies each of the requirements of Rule 23(a) and Rule 23(b)(3), final certification of the settlement class is warranted.

### B. Final Approval of the Class Action Settlement

Under Rule 23(e), the claims of a certified class may be settled only with the Court's approval. The Court acts in a protective capacity as fiduciary for absent class members by assuring that the settlement terms are "fair, reasonable, and adequate" in exchange for the release of the class claims. Fed.R.Civ.P. 23(e)(2); *see In re Gen. Motors Corp.,* 55 F.3d at 805. The Court must "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." *In re Gen. Motors Corp.,* 55 F.3d at 785 (quoting 2 *Newberg on Class Actions* § 11.41, at 11–88 (3d ed.1992)). Where settlement negotiations precede class certification, and settlement and class certification are sought simultaneously, the Court must be "even more scrupulous" than usual to safeguard against abuses. *Id.* at 805. This "heightened standard" is intended to ensure that the class counsel has engaged in sustained advocacy throughout the proceedings and protected the interests of all putative class members. *See Prudential II,* 148 F.3d at 317. The fairness determination is ultimately committed to the sound discretion of the Court. *Bryan v. Pittsburg Plate Glass Co.,* 494

14

F.2d 799, 801 (3d Cir.). For the reasons that follow, the settlement is entitled to a presumption of fairness and is fair, reasonable, and adequate for purposes of Rule 23(e).

### i.    *Presumption of Fairness*

A class settlement is entitled to an "initial presumption of fairness" when "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Gen. Motors,* 55 F.3d at 785 (citing 2 *Newberg on Class Actions* § 11.41 at 11–88 (3d ed.1992)); *Manual for Complex Litigation (Third* ) § 30.42, at 238 (1997). This presumption may attach even where, as here, settlement negotiations precede class certification. *See In re Warfarin,* 391 F.3d at 535.

The settlement here clearly satisfies these criteria. The class settlement was the product of months of negotiations between highly experienced counsel, and after extensive discovery, investigation, and legal analysis. In addition, not one class member objected to the terms of the settlement agreement and none opted-out. This alone should be enough for the presumption of fairness to attach. *See McCoy v. Health Net, Inc.,* 569 F.Supp.2d 448, 458–59 (D.N.J.2008); *Varacallo v. Ma. Mut. Life Ins. Co.,* 226 F.R.D. 207, 235 (D.N.J.2005). In addition, the Court directly oversaw the negotiations during which the settlement was reached. Participation of an independent mediator in settlement negotiations "virtually insures that the negotiations were conducted at arm's length and without collusion between the parties." *Bert v. AK Steel Corp.,* No. 02–467, 2008 WL 4693747 (S.D.Ohio Oct.23, 2008) (internal citations omitted); *see also Milliron v. T–Mobile USA, Inc.,* No. 08–4149, 2009 WL 3345762, at *5 (D.N.J. Sept.14, 2009) (finding presumption applies when negotiations occurred before federal judge); *In re LG / Zenith Rear*

*Projection Tel. Class Action Litig.,* No. 06–5609, 2009 WL 455513, at *6 (D.N.J. Feb.18, 2009) (same).

### ii. Fairness of the Class Settlement

In *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975)[2], the Third Circuit identified nine factors that a court should consider in evaluating whether a proposed class action settlement is "fair, reasonable, and adequate." The nine *Girsh* factors include: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) stage of the proceedings and the amount of discovery completed; (4) risks of establishing liability; (5) risks of establishing damages; (6) risks of maintaining the class action through the trial; (7) ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Id.* at 516–17 (citing *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974)). However, due to the "sea-change" in the way class actions have evolved since *Girsh* was decided, the Third Circuit has instructed courts to address other concerns as they may arise in each case:

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

---

[2] The *Girsh* factors are only a guide for courts to consider, and not all need be met in order for a settlement to receive final approval. *In re Am. Fam. Enters.,* 256 B.R. 377, 418 (D.N.J. 2000) (*Girsh* factors are "a guide and the absence of one or more does not automatically render the settlement unfair").

*Prudential II,* 148 F.3d at 324. These set of considerations embody a substantive inquiry into the terms of the settlement itself and a procedural inquiry into the negotiation process. *In re Prudential Ins. Co. of Am. Sales Practice Litig. (Prudential I* ), 962 F.Supp. 450 (D.N.J.1997) (citing *In re Gen. Motors,* 55 F.3d 796).

### a. Complexity, Expense, and Duration of Litigation

This factor is intended to "capture 'the probable cost, in both time and money, of continued litigation.' " *In re Gen. Motors,* 55 F.3d at 812 (quoting *Bryan,* 494 F.2d at 801). Where the complexity, expense, and duration of litigation are significant, the Court will view this factor as favoring settlement. *Prudential I,* 962 F.Supp. at 536.

If this action were to continue, the parties would expend considerable time and money pursuing their claims. For start, these cases involve claims that arise under various state and federal statutes. While the differences in substantive law are not unmanageable, *supra,* it would undoubtedly make the process of litigation complex. *See In re Gen. Motors,* 55 F.3d at 812 (finding complexity arising from a "web of state and federal warranty, tort, and consumer protection claims"). Continued prosecution of this case both before and at trial would therefore require extensive litigation. Heavy dispositive motion practice would be a virtual certainty. By reaching a settlement prior to the time for dispositive motions, the parties "avoid[ ] the costs and risks of a lengthy and complex trial." *Ehrheart v. Verizon Wireless,* 609 F.3d 590, 595 (3d Cir.2010). Since continued litigation would be time-consuming and expensive, settlement makes consummate sense.

### b. Reaction of the Class to Settlement

The second factor seeks to gauge whether members of the class actually support the settlement. *Prudential II,* 148 F.3d at 318. Courts generally assume that silence constitutes "tacit

consent" to the settlement terms. *Bell Atl. Corp. v. Bolger,* 2 F.3d 1304, 1314 n. 15 (3d Cir.1993) (citing *Shlensky v. Dorsey,* 574 F.2d 131, 148 (3d Cir.1978)). Thus, courts looks to the "number and vociferousness of the objectors." *In re Gen. Motors,* 55 F.3d at 812.

Here, not one single member from the class objected to the terms of the settlement, and no member of the class opted out. While this type of response weighs in clear favor of the settlement, *Weber v. Gov't Emp. Ins. Co.,* 262 F.R.D. 431, 445 (D.N.J.2009); *In re Cendant Corp., Derivative Action Litig.,* 232 F.Supp.2d 327, 333–34 (D.N.J.2002), the Third Circuit has cautioned that the inference of silent approval may be unwarranted in cases where the settlement and class action notice are sent in tandem. This is because class members are not in a position to weigh the relative strengths and weaknesses of the settlement terms. *See In re Gen. Motors,* 55 F.3d at 812–13. While mindful of this admonition, the inference of approval is still warranted in this case. Unlike *General Motors,* the notice that was mailed out to potential class members included a clear and informative summary about the claims in each of the underlying cases, placing potential class members in a better position to judge the terms of the settlement agreement. The class reaction strongly supports the settlement.

### b. *Stage of the Proceedings and Amount of Discovery Completed*

This factor considers the degree of case development accomplished by counsel prior to settlement. *See In re Gen. Motors,* 55 F.3d at 813. For the proceedings to be sufficiently developed to foster a fair settlement, the parties must have "an adequate appreciation of the merits of the case before negotiating." *Id.* Courts therefore endeavor into "the type and amount of discovery the parties have undertaken." *Prudential II,* 148 F.3d at 319. In general, post-discovery settlements are more likely to be fair and reflective of the true value of the claims in the case. *See Bolger,* 2 F.3d at 1314.

18

The parties entered the settlement armed with much (informal) discovery. A significant volume of documents were produced, and all of the data necessary to ascertain both the amount of the alleged underpayment/delayed payments was known, as were all bases of CFG's allegation that any FLSA/NJWHL violations were committed in good faith. Thus, both parties were in an excellent position to enter negotiations based on their unique knowledge of the underlying facts. *See In re Cendant Corp. Litig.,* 264 F.3d at 236 (finding appreciation for merits despite settlement at an early stage of discovery). With extensive discovery and due diligence, class counsel clearly possessed sufficient information to assess the relative strengths and weaknesses of their case and reach a fair bargain. The stage of proceedings factor thus weighs in favor of approving the settlement.

### d. Risks of Establishing Liability and Damages

The fourth and fifth *Girsh* factors survey the "possible risks of litigation" by balancing the likelihood of success, and the potential damages award, against the immediate benefits offered by settlement. *Prudential II,* 148 F.3d at 319. Where the risks of litigation are high, these factors weigh in favor of the settlement. *See id.* Because damages are contingent on establishing liability, "the same concerns animate both of these elements." *McCoy,* 569 F.Supp.2d at 461. To properly weigh these considerations, the Court should not press into the merits of the case and instead rely to a certain extent on the estimation provided by class counsel, who is experienced with the intricacies of the underlying case. *See Dewey v. Volkswagen of Am.,* 728 F.Supp.2d 546, 584 (D.N.J.2010) (citing *In re Ikon Office Solutions, Inc. Sec. Litig.,* 209 F.R.D. 94, 105–06 (E.D.Pa.2002)); *Weber,* 262 F.R.D. at 445 (quoting *Perry v. FleetBoston Fin. Corp.,* 229 F.R.D. 105, 115 (E.D.Pa.2005)). The immediate cash payout provided by the class settlement offers a

substantial benefit over the many risks and costs Plaintiffs would face in litigating their claims to a conclusion.

First, it is not clear that Plaintiff could maintain her state claims for unpaid overtime alongside the federal causes of action under the FLSA. In *De Asencio v. Tyson Foods,* 342 F.3d 301, 309 (3d Cir.2003), the Third Circuit directed courts to analyze, on a case-by-case basis, whether the joinder of state law overtime claims with a claim under the FLSA is a proper exercise of supplemental jurisdiction. Where state law issues "substantially predominate," the state claims may be dismissed without prejudice for resolution by state tribunals. *Id.* (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).

Second, even assuming the state law claims could remain, Plaintiff's ability to succeed on those claims depends on whether CFG could demonstrate good faith.

Third, any issues that survived summary judgment would go to trial before a jury. A trial on the merits always entails considerable risk. *Weiss v. Mercedes–Benz of N. Am., Inc.,* 899 F.Supp. 1297, 1301 (D.N.J.1995). This is particularly true here, given the intervention of a third-party hacker which caused the underlying interruption of the Kronos system. *See In re Cendant Corp.,* 264 F.3d at 239 (recognizing the increased risk of establishing liability when a jury is presented with competing expert testimony).

Finally, even if Plaintiffs were to succeed on the merits, the quantum of damages that they could collect is also uncertain. Throughout, CFG could be expected to continue their zealous defense and would possibly appeal if Plaintiffs prevailed. In the fact of such considerable risks, an immediate cash settlement provides certainty and offers a significant benefit to all class members.

*e. Risks of Maintaining the Class Action Through Trial*

The sixth *Girsh* factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *In re Warfarin,* 391 F.3d at 538. This factor is important because the prospects for obtaining certification impact the range of recovery that a party can reap from the action. *In re Gen. Motors,* 55 F.3d at 817.

The Court has found that class certification is appropriate for purposes of settlement, and suspects the result would be the same for a litigation class. However, CFG would strenuously contest certification if the case were to proceed. Confronted with a motion to certify a litigation class, instead of a settlement class, the Court would additionally need to consider whether the case would pose intractable management problems. *See Amchem,* 521 U.S. at 620. It is also possible that CFG would seek an interlocutory appeal of any order granting class certification. *See* Fed.R.Civ.P. 23(f). In addition, class certification can always be modified at any time before final judgment. Fed.R.Civ.P. 23(c)(1)(C). All in all, the risk of decertification is small. However, this is not an obstacle to approval. The Third Circuit cast some doubt on how "significant" this factor is in cases where a settlement class is sought, *Prudential II,* 148 F.3d at 321, and some courts in this district have discredited the importance of this factor in settlement-only classes, *e.g., In re Schering–Plough/Merck Merger Litig.,* No. 09–1099, 2010 WL 1257722, at \*11 (D.N.J. March 26, 2010).

### f. Ability of Defendant to Withstand a Greater Judgment

This factor "is concerned with the whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *In re Cendant Corp.,* 264 F.3d at 240. The Court is not in a position to determine whether CFG could withstand a greater judgment than the substantive settlement. However, a settlement amount greater than the payouts provided under the settlement would likely be difficult to attain given that they are largely based on figures from

payroll records. This factor therefore does not favor or disfavor settlement. *See In re Warfarin,* 391 F.3d at 538 ("[T]he fact that [defendant] could afford to pay more does not mean that it is obligated to pay any more than what the ... class members are entitled to under the theories of liability that existed at the time the settlement was reached."). Indeed, courts in this district regularly find a settlement to be fair even though the defendant has the practical ability to pay greater amounts. *See, e.g., McCoy,* 569 F.Supp.2d at 462–63; *Weber,* 262 F.R.D. at 446; *Varacallo,* 226 F.R.D. at 239.

### g. *Reasonableness of the Settlement in Light of the Best Possible Recovery and All Attendant Risks of Litigation*

The final two *Girsh* factors collectively "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re Warfarin,* 391 F.3d at 538. To make this determination, the Court analyzes the reasonableness of the settlement against the best possible recovery and the risks the parties would face if the case went to trial. *Prudential II,* 148 F.3d at 322. In cases where monetary relief is sought, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *In re Gen. Motors,* 55 F.3d at 806 (quoting *Manual for Complex Litigation (Second)* § 30.44, at 252 (1985)). Precise value determinations, however, are not necessary. *In re Pet Food Prods. Liability Litig.,* 629 F.3d 333, 355 (3d Cir.2010) (citing *In re Warfarin,* 391 F.3d at 538).

These factors likewise weigh in favor of approving the settlement. The settlement establishes a fund of $475,000 to compensate class members for unpaid/delayed wages. Each state law class member will receive a payout dependent on the amount of unpaid/delayed wages they incurred. Because each class member has already received 100% of the originally unpaid/delayed wages, the settlement sums represent a recovery of over 200 cents on the dollar (or 200%) of their

unpaid/delayed wage damages, when added to the wages already paid. This recovery is exceptional, especially in light of all facts at bar and "obviously represents a good value for the class members' claims, and is well within the range of reasonableness." *Weber,* 262 F.R.D. at 447.

### h. Additional Factors

Several additional factors identified by the Third Circuit in *Prudential,* 148 F.3d at 323, also counsel in favor of approving the settlement. The underlying substantive issues are fully matured for adjudication given that the underpayment/delayed payment that is at the center of the case was partially rectified by reconsolidation payments in the first half of 2022. *See McCoy,* 569 F.Supp.2d at 469. Class counsel are highly qualified and experienced in wage and hour class action litigation and consider the terms of the settlement to be fair, reasonable, and adequate. *See Varacallo,* 226 F.R.D. at 240 (citing *Prudential I,* 962 F.Supp. at 543). Finally, the settlement was premised on CFG's payroll records. *See McCoy,* 569 F.Supp.2d at 469.

After careful consideration of the *Girsh* factors, and the presumption of fairness, the Court concludes that the substantive terms of the settlement are eminently fair and that the negotiation process was unassailable. The majority of the *Girsh* factors, and several additional considerations, strongly favor approval. The settlement provides a significant benefit to all class members, which is substantiated by the overwhelmingly positive response from the class. Accordingly, the Court approves the terms of the settlement that resolve the state law class claims.

### C. Approval of the FLSA Collective Action Settlement

Plaintiff also asks the Court to approve the balance of the settlement agreement that resolves the collective action claims under the FLSA. Unlike a traditional class action under Rule 23, potential class members in an FLSA collective action must affirmatively opt-in to be bound by the judgment. *See Lusardi II,* 855 F.2d at 1070. Their failure to do so does not prevent them from

bringing their own suit at a later date. *Id.* (citing *Pentland v. Dravo Corp.,* 152 F.2d 851, 853 (1945)). This differs markedly from a class action instituted under Rule 23(b)(3). *See 5 Newberg on Class Actions* § 16.20 (noting tension between *res judicata* effect of FLSA collective action and Rule 23(b)(3) class action). Thus, the Court does not assume the same "fiduciary" role to protect absent class members as it would under Rule 23 when assessing a proposed settlement resolving FLSA claims.

To approve a settlement resolving claims under the FLSA, the Court must scrutinize its terms for fairness and determine that it resolves a bona fide dispute. *See Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1354 (11th Cir.1982); *see also* H.R.Rep. No. 101–664, at 18–19 (1990). In so doing, the Court ensures that the parties are not "negotiating around the clear FLSA requirements" via settlement. *Collins v. Sanderson Farms, Inc.,* 568 F.Supp.2d 714, 720 (E.D.La.2008). Its obligation "is not to act as caretaker but as gatekeeper." *Goudie v. Cable Commc'n, Inc.,* No. 08–507, 2009 WL 88336, at *1 (D. Or. Jan.12, 2009). As set forth above, the Court has detailed the reasons the settlement is fair.

The "bona fide dispute" requirement is not an issue here. The dispute between the parties centers on whether whether CFG can demonstrate the requisite "good faith" to avoid the imposition of otherwise mandatory liquidated damages as a result of the unpaid/delayed wage amounts following the Kronos outage. Disagreements over "hours worked or compensation due" clearly establishes a bona fide dispute. *Hohnke v. United States,* 69 Fed. Cl. 170, 175 (Fed.Cl.2005). The institution of a federal court litigation followed aggressive prosecution and strenuous defense demonstrates the palpable bona fides of this dispute. *See Lynn's Food,* 679 F.2d at 1354; *see also D.A. Schulte, Inc. v. Gangi,* 328 U.S. 108, 113 n. 8, 66 S.Ct. 925, 90 L.Ed. 1114 (1946). Here, as a result of the settlement, each employee will receive in excess of 100% of the

liquidated damages that could possibly be due under the FLSA. Arguably, there has thus been no compromise of the FLSA claims. However, even assuming it is deemed a compromise of the FLSA claims it clearly represents "a reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching." *Lynn's Food,* 679 F.2d at 1354. Accordingly, the Court approves the portion of the settlement resolving the FLSA claims.

### D. Attorneys' Fees and Expenses

Class counsel also seeks an award of attorneys' fees and reimbursement of expenses in the amount of $163,160.62. This is a common fund case in which fees and costs come directly out of the recovery to the class. *See generally In re Cendant Corp. Litig.,* 264 F.3d at 256. More specifically, class counsel seeks $158,333.33 in fees (33.3%) and $4,827.29 in out-of-pocket expenses. The Court notes preliminarily that it has received not a single objection pertaining to the proposed amount of fees. *See Lenahan,* 2006 WL 2085282, at *19 ("The lack of significant objections from the Class supports the reasonableness of the fee request.").

Courts in the Third Circuit employ the percentage-of-recovery method to award attorneys' fees in common fund cases. *See In re Gen. Motors,* 55 F.3d at 821 (citing *Court Awarded Attorney Fees,* 108 F.R.D. 237, 255 (1985) (hereinafter *Task Force Report* )); *see also Manual for Complex Litigation (Fourth* ) § 14 .121, at 186 (2004). Indeed, it is the prevailing methodology used by courts in this Circuit for wage-and-hour cases. *See, e.g., In re Janney,* 2009 WL 2137224, at *14; *Chemi v. Champion Mortg.,* No. 05–1238, 2009 WL 1470429, at *10 (D.N.J. May 26, 2009); *Lenahan,* 2006 WL 2085282, at *19. Under the percentage-of-recovery approach, the Court must determine whether the percentage of total recovery that the proposed award would allocate to attorneys fees is appropriate "based on the circumstances of the case." *In re Cendant Corp. Litig.,* 264 F.2d at 256. The Court is primarily guided by seven factors identified by the Third Circuit:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000) (citations omitted); *see also In re AT & T Corp.,* 455 F.3d 160, 166 (3d Cir.2006) (noting that courts should also consider any other factors that are "useful and relevant" under the facts of each case) (citations omitted). Each case is different, however, and in some circumstances one single factor may outweigh the rest. *See In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 301 (3d Cir.2005) (citing *Gunter,* 223 F.3d at 195 n. 1). In addition to the *Gunter* factors, the Third Circuit has suggested that courts "cross-check" its fee calculation against the lodestar award method. *Gunter,* 223 F.3d at 195 n. 1. Based on the reasons that follow, the Court finds that the fees requested by Class Counsel are appropriate given the facts of this case.

### i.    *Size of Fund and Number of Persons Benefitted*

As a general rule, the appropriate percentage awarded to class counsel decreases as the size of the fund increases. *See In re Cendant Corp. Prides Litig.,* 243 F.3d 722, 736 (3d Cir.2002) (citing *Task Force Report,* 108 F.R.D. at 256). The inverse relationship is predicated on the belief that increases in recovery are usually a result of the size of the class and not a result of the efforts of counsel. *See Prudential II,* 148 F.3d at 339 (quoting *In re First Fidelity Bancorp. Sec. Litig.,* 750 F.Supp. 160, 164 n. 1 (D.N.J.1990)). The settlement achieved in this case, while substantial, does not create a "mega-fund." *See In re Cendant Corp. Prides Litig.,* 243 F.3d at 736–37. Moreover, the results obtained represent a significant benefit in the face of the many legal and factual risks posed by litigation. The common fund is substantial in that it creates a common fund

of $475,000 for 323 class members.  The benefit to each class member is all the more significant in that it approximates over 100% of the liquidated damages that they would collect if they prevailed at trial. *See Gunter,* 223 F.3d at 199 n. 5 (noting it may be prudent for courts to "to determine what percentage of the plaintiffs' and class members' approximated actual damages the settlement figure represents" in light of the risk of non-recovery). The settlement therefore creates a substantial benefit for a large group of class members.

### ii. Presence or Absence of Substantial Objections

The Notice sent out to each class member expressly advised them that class counsel would apply for an attorney fee award in the amount of 33.3% of the settlement fund. It also set out the procedure for objecting to the fee request. To date, the claims administrator has received no objections—either to the settlement terms generally or to the fee request specifically. The absence of any objection weighs in favor of the fee request. *See In re Rite Aid,* 396 F.3d at 305; *In re Janney,* 2009 WL 2137224, at *14; *Chemi,* 2009 WL 1470429, at *11.

### ii.    Skill and Efficiency of Class Counsel

The skill and efficiency of class counsel is "measured by 'the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel.' " *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 194 (E.D.Pa.2000) (quoting *In re Computron Software, Inc.,* 6 F.Supp.2d 313, 323 (D.N.J.1998)). As noted earlier, class counsel is highly experienced in complex wage-and-hour class action litigation. Based on the Court's experience in supervising this litigation, class counsel has demonstrated the utmost skill and professionalism in effectively managing these consolidated actions and bringing them to a successful conclusion. Defendants counsel are also

savvy, experienced defense attorneys in wage-and-hour cases (March 4, 2011 Sweeney Decl. ¶ 9), and the ability to achieve a favorable result in a case involving such formidable defense counsel is a clear indication of the skill with which class counsel handled these cases. *See In re Elec. Carbon Prods. Antitrust Litig.,* 447 F.Supp.2d 389, 407 (D.N.J.2006). Class counsel's success in bringing this litigation to a conclusion prior to trial is another indication of the skill and efficiency of the attorneys involved. *See Gunter,* 223 F.3d at 198 (noting that the percentage method encourages early settlements by efficient counsel (citing *Manual on Complex Litigation (Third* ) § 24.121, at 207 (1997))). This factor therefore weighs in favor of the fee request.

### iii.    *Hours Worked and Risk of Non–Payment*

Courts consider the risk of non-payment in light of the Defendant's ability to satisfy an adverse judgment, *Yong Soon Oh v. AT & T Corp.,* 225 F.R.D. 142, 152 (D.N.J.2004), or the risk of establishing liability at trial, *In re Cendant Corp.,* 232 F.Supp.2d at 339. Although the Court has no reason to believe Defendant could not satisfy an adverse judgment, *supra,* class counsel faces a risk of non-payment due to the difficulty of establishing liability at trial. Class counsel has prosecuted this case on a contingent basis, with no retainer. As described above, the case poses a number of genuine factual and legal risks. CFG presents a defense that, if successful, could relieve the company from any liability. In short, class counsel undertook substantial risk that the litigation would yield little or no recovery and leave them completely uncompensated for their time.

Class counsel has expended well over 100 hours in bringing this case to a favorable resolution.  Given the complexity of the issues involved in this case and the activities performed to date, the hours incurred are entirely reasonable. The considerable amount of time devoted to this case, coupled with the risk of non-payment, also weighs in favor of the fee request.

### iv.    *Awards in Similar Cases*

The requested fee is also consistent with awards in similar cases. To address this factor, the Court should (1) compare the actual award requested to awards in comparable settlements, and (2) ensure that the award is consistent with what an attorney would have likely received if the fee was negotiated on the open market. *Dewey*, 728 F.Supp.2d at 604. In common fund cases, fee awards generally range anywhere from nineteen percent (19%) to forty-five percent (45%) of the settlement fund. *See In re Gen. Motors*, 55 F.3d at 822 (citing *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F.Supp. 525, 533 (E.D.Pa.1990)). The fee requested in this case, which represents 32.6% of the settlement fund, clearly falls within this range and is entirely consistent with fee awards for similar wage-and-hour cases in this Circuit and throughout the country. *See, e.g., Lenahan*, 2006 WL 2085282, at *19 (thirty percent (30%)); *In re Janney*, 2009 WL 2137224, at *16 (thirty percent (30%)); *Adeva v. Intertek USA Inc.*, No. 09–1096, ECF Entry No. 228 (D.N.J. Dec. 22, 2010) (thirty-four percent (34%)); *Bernhard*, No. 08–4392, ECF Entry No. 40 (D.N.J. Feb. 3, 2010) (thirty-three percent (33%)); *see also, e.g., Rotuna v. West Customer Mgmt. Group, LLC,* No. 09–1608, 2010 WL 2490989, at *7–*8 (N.D. Ohio June 15, 2010) (thirty-three percent (33%)); *Khait v. Whirlpool Corp.*, No. 06–6381, 2010 WL 2025106, at *8 (E.D.N.Y. Jan.20 2010) (thirty-three percent (33%)); *Stefaniak v. HSBC Bank USA, N.A.*, No. 05–720, 2008 WL 7630102, at *3 (W.D.N.Y. June 28, 2008) (thirty-three percent (33%)); *Gilliam v. Addicts Rehab. Ctr. Fund*, No. 05–3452, 2008 WL 782596, at *5 (S.D.N.Y. Mar.24, 2008) (thirty-three percent (33%)). The percentage award in this case is also consistent with prevailing contingent fee rates in non-class action cases. *See In re Lucent Tech., Sec. Litig.*, 327 F.Supp.2d 426, 442 (D.N.J.2006) (observing "the customary contingent fee would likely range between 30% and 40% of the recovery."); *In re Ikon Office Solutions*, 194 F.R.D. at 194 (same).

  *v. Expenses*

The Court likewise finds that class counsels' request for reimbursement of $4,827.29 in actual out-of-pocket litigation expenses is appropriate given that such expenses have been adequately documented and are reasonable based on the circumstances of this case. *See generally In re Safety Components, Inc. Sec. Litig.,* 166 F.Supp.2d 72, 108 (D.N.J.2001) ("Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." (citing *Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1225 (3d Cir.1995))).

**E.    Service Payments to Named Plaintiffs**

Class counsel also seeks an general release payment from the common fund in the amount of $5,000 for the named Plaintiff. Such general release or service payments are fairly common in class action lawsuits involving a common fund for distribution to the class. *See Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 145 (E.D.Pa.1990) (quoting *In re S. Ohio Correctional Facility,* 175 F.R.D. 270, 272 (S.D.Ohio 1997)). The purpose of these payments is to compensate named plaintiffs for "the services they provided and the risks they incurred during the course of class action litigation," *id.,* and to "reward the public service" of contributing to the enforcement of mandatory laws, *see In re Cendant,* 232 F.Supp.2d at 344 (citing *In re SmithKline Beckman Corp. Sec. Litig.,* 751 F.Supp. 525, 535 (E.D.Pa.1990)); *see also Rodriguez v. West Publ'g Corp.,* 563 F.3d 948, 958–59 (9th Cir.2009) (describing utility of incentive awards). An incentive award that comes out of the payment allocated for attorneys fees need not be subject to intense scrutiny because the interests of the public and the defendants are not directly affected. *See In re Cendant,* 232 F.Supp.2d at 344 (citing *In re Presidential Life Sec.,* 857 F.Supp. 331, 337 (S.D.N.Y.1994)). Where the payments come out of the common fund independent of attorneys' fees, the Court must "carefully review" the request for fairness to other class members. *See Varacallo,* 226 F.R.D. at

257.  Here, he the payment to be made to the named Plaintiff is technically not an incentive award because she has executed a general release in favor of CFG that no other class member has. However, it can still be viewed in the same prism.

Courts have ample authority to award incentive or "service" payments to particular class members where the individual provided a benefit to the class or incurred risks during the course of litigation. *See, e.g., In re Elec. Carbon Prods. Antitrust Litig .,* 447 F.Supp.2d at 412 ((citations omitted)); *Varacallo,* 226 F.R.D. at 258; *In re Cendant Corp.,* 232 F.Supp.2d at 327 (citing *Brotherton v. Cleveland,* 114 F.Supp.2d 907, 913 (S.D. Ohio 1991)); *see also Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir.1998) (identifying factors relevant to awarding incentive payments (citing *Spicer v. Chicago Bd. Options Exchange, Inc.,* 844 F.Supp. 1226, 1267 (N.D.Ill.1993)).

Under the circumstances at bar, the Court believes the general release payment to be made to the named-Plaintiff from the common fund is fair and reasonable and approves same.

## III.    CONCLUSION

Based on the reasons set forth above, the Court: (a) certifies the state class for purposes of this settlement; (b) approves the proposed settlement agreement in its entirety; (c) awards class counsel the attorneys' fees and costs requested; and (d) awards the general release payment requested.

Dated:

Zahid N. Quraishi
United States District Court Judge